# UNITED STATES DISTRICT COURT
for the
Southern District of California

FILED
DEC 2 3 2015
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

iPhone Cellular Phone
SN: F4KQHBXPGRYF

)
)
)   Case No.
)
)         '15 MJ 3755
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
SEE ATTACHMENT A

located in the ___SOUTHERN___ District of ___CALIFORNIA___, there is now concealed *(identify the person or describe the property to be seized)*:
SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 8 USC 1324 | ALIEN SMUGGLING |

The application is based on these facts:
SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Applicant's signature

David R. Steiman, Border Patrol Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 12/22/15

_____
Judge's signature

City and state: San Diego, California

Honorable William V. Gallo
*Printed name and title*

ATTACHMENT A

TO BE SEARCHED:

An iPhone MKR62LL/A; IMEI: 353309074470335; Serial: F4KQHBXPGRYF ("**Target Telephone 7**").

**Target Telephone 7** is currently being stored at the Chula Vista Border Patrol Station, 311 Athey Street San Diego, CA 92173.

## ATTACHMENT B

The following evidence to be searched for and seized pertains to violations of 18 U.S.C. § 371 (Conspiracy) and 8 U.S.C. § 1324 (Alien Smuggling):

1. Communications, records, or data including but not limited to emails, text messages, photographs, audio files, videos, or location data:

   a. tending to indicate efforts to smuggle aliens into the United States from Mexico or transport illegal aliens within the United States;

   b. tending to identify other facilities, storage devices, or services–such as email addresses, IP addresses, phone numbers–that may contain electronic evidence tending to indicate efforts to smuggle aliens into the United States from Mexico or transport illegal aliens within the United States;

   c. tending to identify co-conspirators, criminal associates, or others involved in efforts to smuggle aliens into the United States from Mexico or transport illegal aliens within the United States;

   d. tending to identify travel to or presence at locations involved in the smuggling of aliens into the United States from Mexico or transporting illegal aliens within the United States such as drop off and pick up locations, stash houses load houses, or delivery points;

   e. tending to indicate payment for the smuggling of aliens into the United States or the transportation of aliens within the United States;

   f. tending to identify the user of, or persons with control over or access to, the subject phone; or

   g. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data above.

# AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, David Steiman, being duly sworn, hereby depose and state as follows:

## BACKGROUND AND EXPERIENCE

1. I am a United States Border Patrol Agent ("BPA") and have been a Border Patrol Agent since December of 2007.

2. I am currently assigned to the San Diego Sector Joint Targeting Team ("JTT"). The JTT is responsible for investigating, arresting and prosecuting criminal smuggling organizations that utilize the Southern District of California as an operational corridor. These investigations are complex investigations of mid-level criminal smuggling organizations. JTT agents deploy in plainclothes attire and drive unmarked agency vehicles. I have been assigned to the JTT since April of 2015. In the course of my duties, I investigate and prepare for prosecution cases against persons involved in the inducement of illegal entry of undocumented aliens into the United States; the smuggling of undocumented aliens into the United States; the transportation and harboring of undocumented aliens within the United States; and the utilization of illegally obtained, counterfeit, altered or genuine immigration documents by undocumented aliens to illegally gain entry or remain in the United States. I have extensive training and experience with identifying cross-border alien smuggling operations.

3. Through my training and experience, I have gained working knowledge and insight into the typical workings of criminal organizations. I have also gained extensive information as to the normal operation habits of persons who make their living as alien

smugglers. Through my training, experience and conversations with other experienced criminal investigators, I have become familiar with the behavior, speech, routes and method of operations, to avoid detection and apprehension by law enforcement officers.

4. Based upon my training and experience as a USBP Agent, and consultations with law enforcement officers experienced in alien smuggling investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

   a. Alien smugglers will use cellular telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

   b. Alien smugglers will use cellular telephones because they are able to actively monitor the progress of the illegal aliens while they are in transit.

   c. Alien smugglers and their accomplices will use cellular telephones because they can easily arrange and/or determine what time the smuggled aliens will arrive at predetermined locations.

   d. Alien smugglers will use cellular telephones to direct drivers to synchronize a drop off and/or pick up time of the smuggled aliens.

   e. Alien smugglers will use cellular telephones to notify or warn their accomplices of law enforcement activity including the presence and location of marked and unmarked units, as well as the operational status of USBP checkpoints.

   f. Alien smugglers will use cellular telephones to make arrangements with the smuggled aliens prior to the smuggling event, and to arrange for payment after the smuggling event.

AFFIDAVIT IN SUPPORT OF APPLICATION          2
FOR SEARCH WARRANT

## PURPOSE OF AFFIDVAIT

5. I make this affidavit in support of an application for a search warrant in furtherance of an alien smuggling investigation conducted by U.S. Border Patrol ("USBP") Agents and Department of Homeland Security, Homeland Security Investigations ("HSI") Special Agents for the following target property: four cellular telephones seized on December 8, 2015 from Maurilio MOSLEY-Gonzalez ("MOSLEY"), two cellular telephones seized from Elizabeth RAMIREZ ("RAMIREZ"), one cellular telephone seized from Jazmin MOLINA-Vargas ("MOLINA") and one cellular telephone seized from Olivia QUIROZ-Roman ("QUIROZ"). Cellular telephone 1 seized from MOSLEY, is (1) Samsung Galaxy Grand Prime SM-G530T1; IMEI: 355257070237273; Serial: R58GA0N3EFA (hereinafter "**Target Telephone 1**"). Cellular telephone 2 seized from MOSLEY, is (1) Samsung Galaxy Grand Prime SM-G530T1; IMEI: 359130062908100; Serial: R28GA1YC29X (hereinafter "**Target Telephone 2**"). Cellular telephone 3 seized from MOSLEY, is (1) LG Optimus LG970; IMEI: 990002501584153; Serial: 312KPTM0156865 (hereinafter "**Target Telephone 3**"). Cellular telephone 4 seized from MOSLEY, is (1) Samsung Galaxy S6 Edge SM-G925T; IMEI: 359715060454907; Serial: R58G50NTX6H (hereinafter "**Target Telephone 4**"). Cellular telephone 5 seized from RAMIREZ, is (1) Samsung Galaxy S4 SM-G360T1; IMEI: 359354069177531; Serial: R28G81P1VXT (hereinafter "**Target Telephone 5**"). Cellular telephone 6 seized from RAMIREZ, is (1) Samsung Galaxy Light SGH-T399N; IMEI: 358765060907215; Serial: RV8G202HR1H (hereinafter "**Target Telephone 6**"). Cellular telephone 7 seized from MOLINA, is (1) iPhone MKR62LL/A; IMEI: 353309074470335; Serial: F4KQHBXPGRYF (hereinafter "**Target Telephone 7**"). Cellular telephone 8 seized from QUIROZ, is

AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

3

1  (1) Samsung Galaxy Grand Prime; IMEI: 357549066334702; Serial: R28G91JH5BN (hereinafter "**Target Telephone 8**").

6.  **Target Telephones 1-7** were seized from MOSLEY, RAMIREZ and MOLINA after agents apprehended them for assaulting a Border Patrol Agent and admitting to coordinating an alien smuggling event. The investigation of the assault led to information on an alien smuggling event that happened earlier in the day on December 8, 2015. It is believed that **Target Telephones 1-7** were used by MOSLEY, RAMIREZ and MOLINA to communicate with co-conspirators during the alien smuggling event on December 8, 2015. **Target Telephone 8** was seized from QUIROZ after agents apprehended her while being harbored by MOSLEY, RAMIREZ and MOLINA during an alien smuggling event on December 8, 2015. MOSLEY, RAMIREZ and MOLINA are being investigated for Transportation of an Illegal Alien, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii), in the Southern District of California. Probable cause exists to believe that **Target Telephones 1-8** contain evidence relating to violations of Title 8, United States Code section 1324. The specified telephones are currently being stored at the Chula Vista Border Patrol Station, 311 Athey Street San Diego, CA 92173. Based upon my experience and training, and all the facts and opinions set forth in this Affidavit, I believe the items to be seized set forth in Attachment B (incorporated herein) will be found in the item to be searched as described in Attachment A (incorporated herein). These items may be or lead to: (1) evidence of the existence of alien smuggling or conspiracy to smuggle aliens in violation of 8 U.S.C. § 1324; (2) contraband, fruits of crime, or things otherwise criminally possessed; and (3) property designed or intended for use, or which is or has been used as a means of committing criminal offenses.

## STATEMENT OF PROBABLE CAUSE

7. On December 8th, 2015, Border Patrol Agent Scott Pinckney was operating in an unmarked U.S. Border Patrol (BP) Ford F-250 and was performing his duties clearly displaying his status as a law enforcement officer. Agent Pinckney was wearing identifiers on both sleeves and had identifiers on the back and front of his shirt. Agents Pinckney is familiar with the appearance and behavior of individuals involved in smuggling undocumented aliens, narcotics, and contraband into the United States. Agent Pinckney has experience investigating narcotics and alien smuggling cases. Agent Pinckney has apprehended numerous smuggling attempts, most of which were intercepted along the I-15 smuggling corridor. Agent Pinckney is trained, certified, and authorized to enforce immigration and customs violations. Agent Pinckney has received training that includes but is not limited to highway interdiction, behavioral analysis, and interview techniques.

8. At approximately 01:50 p.m., Agent Pinckney was travelling northbound in lane three along I-15, north of the Border Patrol Checkpoint in Temecula, California, observing northbound traffic when he observed a gold Hyundai, bearing California license plate 7HJH704, pass his unit traveling in the number one lane of the freeway. This was a newly issued license plate on a 2006 vehicle. Smugglers tend to register vehicles, used for smuggling, with new license plates. The purpose of this is to try to mask the identity of the vehicle and driver. The vehicle was occupied by a female driver and a male passenger. Agent Pinckney pulled alongside the vehicle on the passenger side. The driver was staring straight ahead and would not look over. The driver then moved from the number one lane over into

AFFIDAVIT IN SUPPORT OF APPLICATION    5
FOR SEARCH WARRANT

the number two lane. Agent Pinckney perceived this to be an attempt to evade law enforcement because there were vehicles ahead of her in both lanes. Agent Pinckney has encountered this behavior during previous smuggling events.

9. Record checks revealed the vehicle had just crossed the United States/Mexico Border on Sunday December 6, at 2:31 a.m. through the San Ysidro Port of Entry, admitting two people. This vehicle had been re-registered on October 10, 2014. Re-registering vehicles is a common tactic utilized by smugglers to avoid detection and apprehension. DHS record checks also revealed that the vehicle had crossed the U.S./Mexico border approximately 83 times in the last 6 months. The vehicle was registered to Ramirez, Elizabeth, at 3970 Newton, San Diego, California. Records checks also indicated a DHS database alert as being the subject of a current investigation.

10. Agent Pinckney continued to follow the vehicle northbound on Interstate 15. The vehicle abruptly changed lanes from the number two lane to the number three lane again for no apparent reason as the traffic was the same in both lanes. The vehicle then abruptly cut across the freeway from the number three lane all the way over to the Winchester Road off ramp and exited the freeway. At this time Agent Pinckney activated his emergency equipment to conduct a vehicle stop. The vehicle proceeded northbound on the off ramp in the left lane and then abruptly moved over into the middle lane. The vehicle then turned eastbound onto Winchester Road, Southbound onto Ynez, and Westbound on to Palm Plaza. The vehicle pulled into a parking space at the Pier One Imports Store. As Agent Pinckney followed the vehicle he noticed that there was a passenger who was sitting fully

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANT

6

reclined in the passenger seat. This is a common tactic used by smuggled aliens to avoid detection.

11. As Agent Pinckney exited his vehicle and approached the Hyundai, both occupants opened their doors and exited their vehicle. Agent Pinckney instructed both occupants to get back into the vehicle. Both subjects complied. Agent Pinckney identified himself as a United States Border Patrol Agent and asked the driver later identified as Elizabeth RAMIREZ where she was going. RAMIREZ stated that she was going to buy furniture. Agent Pinckney then asked RAMIREZ to step out of the vehicle to speak with her.

12. Agent Pinckney asked RAMIREZ again where she was going and where she was coming from. RAMIREZ stated that they were traveling from San Diego to buy furniture for her apartment. Agent Pinckney asked RAMIREZ who the passenger in the vehicle was. She stated that it was her friend. Agent Pinckney asked her how long she had known him and she responded that she had known him for about 10 years. Agent Pinckney asked her what his name was and she stated Mauricio. Agent Pinckney asked what his last name was and she responded that she did not know.

13. Agent Pinckney then spoke with the passenger, identified as MOSLEY-Gonzalez, Maurilio Arturo. He asked MOSLEY where they were coming from and where they were going. MOSLEY stated that they were coming from San Diego and going to Los Angeles to buy furniture. Agent Pinckney asked MOSLEY for identification. He handed Agent Pinckney a California driver's license. As MOSLEY handed over the driver's license, Agent Pinckney noticed that his hands were visibly shaking. Agent Pinckney asked MOSLEY why his hands were shaking and why he appeared to be so nervous. He stated he liked to be nervous.

AFFIDAVIT IN SUPPORT OF APPLICATION    7
FOR SEARCH WARRANT

14. Agent Pinckney asked RAMIREZ for consent to conduct a K-9 sniff of both the interior and exterior of the vehicle. RAMIREZ gave consent. Agent Pinckney also asked RAMIREZ for consent to conduct a hand search of the vehicle. RAMIREZ again gave consent. As Agent Pinckney began to ask RAMIREZ more questions about her itinerary, she stated that she could no longer communicate in the English language and wanted to speak to someone in Spanish. At this time Agent Zachary arrived on scene and Agent Pinones arrived a few minutes later. Agent Zachary began to question RAMIREZ. Agent ZACHARY again questioned RAMIREZ about her itinerary and asked for consent to conduct a K-9 sniff and hand search of the vehicle. Again she gave consent. RAMIREZ was in possession of **Target Telephones 5-6** and claimed them. Agent Zachary then had MOSLEY exit the vehicle to conduct a pat down and ask him further questions. Agent Zachary asked MOSLEY if he had ever been arrested and if he was on probation or parole. MOSLEY responded that he was on probation for alien smuggling. Agent Zachary asked MOSLEY to move back towards his marked unit to allow Agent Pinckney to conduct a K-9 sniff of the vehicle.

15. Agent Pinckney retrieved his K-9 partner Kira-B CCEP#090823 from his vehicle. Agent Pinckney and Kira-B are trained and certified to detect concealed humans and the odors of narcotics and their derivatives. Agent Pinckney and Kira-B performed an exterior and interior sniff of the vehicle. Kira-B alerted to the vehicle.

16. A subsequent search of the vehicle revealed a small handbag containing $18,280 in U.S. currency. The search also revealed **Target Telephones 1-3** concealed under the front passenger seat as well as

the front passenger floor board. The "SIM" memory chips had been removed from some of these phones.

17. As Agents Pinckney and Pinones were searching the vehicle, Agent Zachary attempted to put MOSLEY in the back seat of his marked unit. At this point MOSLEY pushed away from the vehicle and fled.

18. MOSLEY is being held in CBP custody pending criminal prosecution for 18 USC 111 Assault on a Federal Officer.

19. Agent Zachary gave chase and shouted commands to MOSLEY to stop and he refused. MOSLEY continued running across Ynez Road and into the parking lot of the Temecula Promenade Mall located on the south east corner of Winchester Road and Ynez Road in Temecula.

20. Agent Zachary continued chasing MOSLEY into the Sushi Love Boat restaurant, located at 26480 Ynez Road, suite #3, and was hiding in the restrooms.

21. Agent Zachary used his service radio and requested assistance at his location. He then walked over to the front entrance of the restaurant and waited for additional agents to assist in the search for MOSLEY. He waited for about a couple of minutes, then chose to go into the restaurant by himself as back-up was not responding to his radio requests.

22. Agent Zachary was told by the restaurant workers that MOSLEY was in hiding in the bathroom. Agent Zachary gave several loud verbal commands at the restrooms. He identified himself as a law enforcement officer and told the male to come out with his hands up. The door suddenly opened and Agent Zachary could see MOSLEY standing in the partially opened door way. Agent Zachary then ordered him to show his hands and get on the ground. MOSLEY got onto both knees. Agent Zachary then ordered him to go down to his stomach. MOSLEY told
AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT           9

1 him he would not get down on his stomach. Agent Zachary transitioned
2 to an appropriate use of force weapon, X-26 TASER.
3     23. At this point, MOSLEY got back onto his feet. Having
4 already been in a foot pursuit with MOSLEY, Agent Zachary took his
5 action of rising back to his feet to indicate that he intended to
6 flee again and/or assault him. Agent Zachary believed this to be the
7 case as he was blocking MOSLEY's only path of escape from the
8 restaurant. MOSLEY's failure to comply was perceived as an active
9 attempt to escape. After completely ignoring any and all of Agent
10 Zachary's commands, he deployed the TASER into MOSLEY's mid-section.
11 MOSLEY immediately reached to his upper mid-section and pulled one
12 of the TASER darts out. The other dart stuck into his stomach area.
13 The TASER was not successful in making contact with MOSLEY.
14     24. At this point, MOSLEY advanced towards Agent Zachary.
15 MOSLEY further resisted by pushing Agent Zachary into the wall and
16 was able to get away. MOSLEY ran out of the restaurant into the
17 parking lot.
18     25. Agent Pinones was in the parking lot outside of the
19 restaurant and assisted Agent Zachary in chasing MOSLEY into the
20 parking lot of the Tilted Kilt restaurant, located at 26520 Ynez
21 Road.
22     26. MOSLEY finally stopped and laid on the ground in the middle
23 of the parking lot. Agent Pinones and Agent Zachary then placed
24 MOSLEY into handcuffs. MOSLEY was in possession of **Target Telephones**
25 **4** and claimed it.
26                             **MOSLEY INTERVIEW**
27     27. On December 8, 2015, agents conducted a post-Miranda
28 interview of MOSLEY. When asked about his involvement in alien

smuggling, MOSLEY stated he had previously been arrested for alien smuggling, is currently on supervised release for that conviction and is currently working for an alien smuggling coordinator in Mexico. MOSLEY also stated that the money discovered during the event was obtained from previous smuggling proceeds.

### RAMIREZ FIRST INTERVIEW

28. On December 8, 2015, agents conducted a post-Miranda interview of RAMIREZ. When asked about her involvement in alien smuggling, RAMIREZ stated that approximately one year ago, MOSLEY offered her an alien smuggling job. Her job is to help MOSLEY transport money, made from alien smuggling, from Los Angeles to San Diego. She would also help MOSLEY transport undocumented aliens in the United States.

### KNOCK AND TALK

29. On December 8, 2015, agents conducted a knock and talk of RAMIREZ's home address. She currently resides at 457 Oaklawn Avenue, Apartment B, Chula Vista, California. A female later identified as Jazmin MOLINA answered the door, and agents asked to speak to all of the adults in the apartment. MOLINA granted consent to enter the apartment. An additional female later identified as Cecilia RAMIREZ-Morales walked out to the living room. Agents asked MOLINA and RAMIREZ-Morales for consent to search the apartment, to which they both granted.

30. During the search of the apartment agents detected someone in the bathroom. Agents asked MOLINA and RAMIREZ-Morales who was in the bathroom, they both stated they did not know. At this time, RAMIREZ-Morales was asked to step outside of the apartment to speak with agents.

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANT
11

31. An additional female later identified as Olivia QUIROZ-Roman eventually exited the bathroom. Agents asked QUIROZ if she lived at the apartment, QUIROZ appeared stunned and did not immediately answer. QUIROZ further stated she was visiting her friend, Agent Rodriguez asked her what her friends name was, to which QUIROZ was unable to produce a name. At this time, she was asked to exit the apartment to speak with agents.

32. QUIROZ was found to be a smuggled undocumented alien and was arrested for being in the United States illegally. QUIROZ was in possession of **Target Telephone 8** and claimed it. MOLINA was arrested for alien smuggling. MOLINA was in possession of **Target Telephone 7** and claimed it.

### RAMIREZ SECOND INTERVIEW

33. On December 9, 2015, agents conducted a second post-Miranda interview of RAMIREZ. She stated that the undocumented alien found at her house was brought there by MOSLEY. He asked RAMIREZ if the undocumented alien could stay at her house and he would pay her $100 USD. MOSLEY told RAMIREZ that they could not transport the UDA female north because her sponsors had not paid the smuggling fee, RAMIREZ agreed. RAMIREZ said she fed and allowed the female UDA to shower while she stayed at her home.

34. Based upon MOSLEY's and RAMIREZ's statements and my experience and investigation in this case, I believe that MOSLEY, RAMIREZ and MOLINA, as well as other persons as yet unknown, were involved in an on-going conspiracy to smuggle aliens. Based on my experience investigating alien smugglers, I also believe that MOSLEY and RAMIREZ may have used **Target Telephones 1-8** to coordinate with co-conspirators, and MOLINA, regarding the smuggling of illegal

aliens, and to otherwise further this conspiracy both inside and outside the United States.

36. Based upon my experience and training, consultation with other law enforcement officers experienced in alien smuggling investigations, and all the facts and opinions set forth in this affidavit, I believe that information relevant to the alien smuggling activities of MOSLEY and his co-conspirators, such as telephone numbers, made and received calls, contact names, electronic mail (email) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the cellular telephone described herein.

## SEARCH PROTOCOL

36. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory

AFFIDAVIT IN SUPPORT OF APPLICATION          13
FOR SEARCH WARRANT

cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

37. Following the issuance of this warrant, I will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

38. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

39. Following the issuance of this warrant, I will collect the subject cellular telephone and, with assistance if necessary from cellular telephone forensic examiners, will attempt to securely power the device, identify whether it is protected by a personal identification number (PIN), determine or circumvent the PIN and image or retrieve data subject to seizure pursuant to this warrant

from the device. The search of the device or of an image on the data on the device will be limited to identifying and seizing data subject to seizure pursuant to this warrant and, in any event, will be limited to only the information to be found on basic cellular telephones: digital, cellular, and/or telephone numbers and/or direct connect numbers assigned to the device; call and direct connect history information; list of contacts stored on the device; text messages stored on the device; and, if equipped as a camera, photographs and videos stored on the device. In the event that I or other personnel lawfully conducting the analysis identify information pertaining to crimes outside the scope of the warrant, such information will not be used in any way unless a new warrant is obtained to search for such information.

40. I, or any other duly authorized federal agent, will personally serve the warrant requested above, and will be assisted by other duly authorized federal investigators.

## CONCLUSION

41. Based on all of the facts and circumstances described above, I believe that probable cause exists to conclude that MOSLEY, RAMIREZ and MOLINA used **Target Telephones 1-8** to facilitate alien smuggling. **Target Telephones 1-8** were likely used to facilitate the offenses by transmitting and storing data, which constitutes evidence, fruits, and instrumentalities of violations of Title 8, United States Code, Section 1324.

42. I also believe that probable cause exists to believe that evidence, fruits and instrumentalities of illegal activity committed by MOSLEY, RAMIREZ and MOLINA continue to exist on **Target Telephones 1-8**.

43. Based upon my experience and training, consultation with other agents in alien smuggling investigations, consultation with other sources of information, and the facts set forth herein, I know that the items to be seized set forth in Attachment B (incorporated herein) are likely to be found in the property to be searched described in Attachment A (incorporated herein). Therefore, I respectfully request that the Court issue a warrant authorizing me, a USBP Agent, or another federal law enforcement agent specially trained in digital evidence recovery, to search the item described in Attachment A, and seize the items listed in Attachment B.

David Steiman
Special Agent
United States Border Patrol

Subscribed and sworn to before me on December 22, 2015.

HONORABLE WILLIAM V. GALLO
UNITED STATES MAGISTRATE JUDGE